[No. 11302. Department One. January 17, 1914.]

MILAN ZIZICH, *Respondent*, v. HOLMAN SECURITY
INVESTMENT COMPANY, *Appellant*.[1]

AGRICULTURE — LABORER'S LIENS—FORECLOSURE — CONTRACT—PER-
FORMANCE OR BREACH—EVIDENCE—SUFFICIENCY. The evidence is in-
sufficient to sustain findings that laborers' contracts to clear land
had been fully performed and that they quit work because ordered
to do so, where, by the preponderance of the evidence, it appears
that the work had not been properly performed, being merely slash-
ing and only about fifty per cent of the work of clearing it; that
eighty per cent of the contract price allowed them was a very
liberal allowance, and that they quit because they had become dis-
satisfied with the allowance made.

VENDOR AND PURCHASER — CONTRACT — PERFORMANCE OR BREACH—
TITLE. Where laborers were to be paid for clearing in part by con-
veyance of lots, they cannot, before completion of the contract and
earning their deeds, quit and claim the full compensation in cash,
because of defects in title to the lots; since the vendor may be able
to convey title when the time for performance arrives.

APPEAL—REVIEW—FINDINGS. Upon a trial *de novo*, under Rem.
& Bal. Code, § 1736, where findings are not sustained by a prepon-
derance of the evidence, they will be reversed on appeal.

Appeal from a judgment of the superior court for Jeffer-
son county, Still, J., entered October 25, 1912, upon findings
in favor of the plaintiff, in an action to foreclose a laborer's
lien. Reversed.

*Tom W. Holman*, for appellant.

*Walter B. Allen* and *U. D. Gnagey*, for respondent.

GOSE, J.—This is an action to foreclose a laborer's lien.
The case was tried to the court. There was a judgment for
plaintiff. The defendant has appealed.

The complaint alleges that, about the first day of Janu-
ary, 1911, the plaintiff and his five assignors began working
for the defendant; that the work consisted in the clearing of
certain lands, at an agreed price of $30 per acre, one-half

[1]Reported in 137 Pac. 1028; 139 Pac. 57.

to be paid in cash and the remainder to be applied upon the purchase price of six lots in the town of Irondale, each of the parties purchasing one lot at an agreed price of $250 per lot; that, under the terms of the contracts, each of the parties became entitled to a deed to his respective lot when the six had cleared one hundred acres of land; that the respondent and his assignors worked from about the first of January, 1911, until about the first day of June-following; that they cleared 115 acres, and were paid in cash the sum of $1,056.33, leaving a balance of $2,393.67; that the respondent and his assignors thereupon demanded good and sufficient deeds to the lots embraced in their respective contracts, and payment for the balance due them; and that the appellant had not at that time, nor has it now, a clear title to the lots. The complaint also alleges, that the respondent and his assignors, in due time, filed a notice of a claim of lien upon the land upon which the clearing was done, and that five of the six lien claimants had assigned their claims of lien to the respondent. The appellant answered, alleging that it had paid the respondent and his assignors $935.89 in cash; that it had credited them on their respective contracts in the aggregate $1,199.51, and alleged that they had cleared 71.12 acres and no more.

The court found that the respondent and his assignors had cleared 74.53 acres; that they had been paid $935.89 in cash, and that there was due them on June 1, 1911, a balance of $1,300. The court also found "that the plaintiff and his assignors continued to work for the defendant under said contracts until on or about June 1, 1911, when they were informed by the defendant that there was no more land to be cleared and that they should quit." The court further found that the appellant's title to the land was defective, and therefore concluded that it had breached its contract in two respects, (a) in requiring the respondent and his assignors to quit, and (b) in that the title to the land which it had agreed to convey to them was defective. These findings and

conclusions were made effective by the decree. A decree was entered in favor of the respondent for $1,300, with interest and attorney's fees, and a lien was established against certain lands of the appellant and foreclosure and sale were directed.

The contract with the respondent and each of his assignors provides:

"The purchaser is to do *clearing work* for this company at the rate of $30 per acre, $15 per acre to apply as a credit on this contract. In addition to this $15 per acre, there will be deducted on the first settlement made for clearing done [about February 10, 1911] five dollars per acre cleared at that time in lieu of cash payment by the purchaser, and $2.50 per acre will be deducted on each acre cleared thereafter until $40 has been paid as the initial payment."

This provision in the several contracts accounts for the discrepancy between the cash payment and the property credits allowed by the appellant. There is a difference of 3.42 acres between the amount of clearing conceded by the appellant and the amount found by the court. In other words, the court found that the respondent and his assignors had cleared 3.42 acres more than the appellant concedes. The land had been logged about 1890, and the clearing consisted in cutting the young growth.

A reading of the testimony makes it clear that the appellant has conceded to the respondent and his assignors a larger credit for clearing than they were entitled to. The testimony shows that they were to clear the land, cut the growth within six inches of the ground, and fall the small timber so that it would all lie in the same general direction, and so as to give it harmony with other clearing which the appellant was having done at the same time by other contractors. The testimony of disinterested witnesses makes it clear that they did not do the "clearing work" in the manner contemplated by their contract, but as one of the witnesses puts it, that they did it "in a careless and improper manner;" that their work was "slashing of a rough sort,"

not "clearing at all;" that they left stumps varying in height from 13½ inches to 43 inches; that as another witness puts it, the ground was "roughly slashed;" that as another witness states, the slashing was "crude and unworkmanlike" and not "clearing in any sense of the word." Another witness says that "they did only slashing work, and it was not well done." Another witness, Mr. William Bishop, testified, that he had had twenty-five years' experience in clearing, that he had gone over their work, and that it was "the roughest slashing," not "cleared at all," and that they had done about sixty per cent of the contract work. Other disinterested witnesses testified that the work they had done was worth from twelve to fifteen dollars per acre. The appellant settled with them for this slashing from time to time on the theory that they had done eighty per cent of the work; that is, it allowed them eighty per cent of the contract price, based upon acres. Under the overwhelming testimony, this allowance was exceedingly liberal.

As we have observed, the court found that the appellant directed the respondent and his assignors to quit. Under the findings of the court, they still owed $200 upon the land and were not then entitled to deeds unless they had been directed to quit. The finding is not within the issues, nor is it supported by the preponderance of the testimony. There is no suggestion in the complaint that the respondent or his assignors were directed to quit. On the other hand, the complaint is drawn upon the theory that they had performed their contract, that they had demanded deeds, and that the appellant's title to the land was defective. The respondent testified that, about June 1, "the force" in charge of the appellant's work told them that the appellant had no more land to clear, and that "we would have to quit." He further testified upon cross-examination, "that all quit in June, 1911; that we quit in June, 1911. J. P. Holman, who had taken charge after Mr. Oliphant left, would not pay us the amount of the acreage we had gone over." One of the plain-

tiff's assignors testified: "We started to work on the defendant's land in January, 1911, . . . We quit in June, 1911." He further said that "we quit finally because J. P. Holman, who had taken charge of the work after Oliphant quit, would not give us pay for the amount of land we cleared." Another of the respondent's assignors testified in rebuttal "that Mr. Holman ordered us to quit, and go to Seattle to get our money." This is all the testimony offered by the respondent which tends to show their reasons for quitting the work on June 1st. Mr. Holman, who was in charge of the work, testified that he did not direct them to quit, but that they quit because they became dissatisfied with the percentage basis which he was allowing them for their slashing. After they had quit, and on June 6, 1911, counsel for the respondent and his assignors wrote the appellant as follows:

"The Austrian laborers insist that they have cleared more acres than shown by your statement, and they are very insistent upon an early settlement. I shall have some one go up to Irondale and measure the land tomorrow or next day, and I wish you would have your surveyor do the same again right away so the matter may be closed. They claim they want to go out to work and will not do so until this is settled."

The appellant's version that they quit voluntarily because they claimed that they were not being paid for all the clearing is corroborated by the silence of the complaint upon this question, by the letter of their counsel, and by all the attending circumstances. There was still clearing to be done. The ground which they had slashed still required much work to clear it within the meaning of the contract.

The trial court concluded, as a matter of law, that the appellant's title to the land which it had agreed to convey to the respondent and his assignors was not a marketable title, and hence that the parties were entitled to a lien. The question of title is not before us. The lots have not been fully paid for. The appellant will have fulfilled its obligation if

it is able to convey title when the time for performance arrives. *Morris v. Columbia Canal Co.*, 75 Wash. 483, 135 Pac. 238.

Our conclusion is that the respondent and his assignors, at the time of the commencement of the action, had been paid in full for their work in money and credits upon their several contracts; that the contracts were breached by the respondent and his assignors, and not by the appellant, and that the respondent has failed to sustain his cause of action by a preponderance of the testimony.

The case was tried in January, 1912. The findings were not signed until October following. A reading of the testimony has persuaded us that, during this interval, some of the testimony in the case must have escaped the attention of the trial judge.

The statute, Rem. & Bal. Code, § 1736 (P. C. 81 § 1225), puts the burden upon this court of trying the case *de novo* in actions legal or equitable tried to the court. In the discharge of this duty, we treat the findings of the trial judge with great respect; but if, upon an examination of the evidence, we become convinced that a preponderance of the testimony is against the findings of the trial judge, it becomes our duty to make our own view effective. *Lewis v. Dean*, 76 Wash. 596, 137 Pac. 341; *Borde v. Kingsley*, 76 Wash. 613, 136 Pac. 1172.

The judgment is reversed, with directions to dismiss the action.

CROW, C. J., ELLIS, MAIN, and CHADWICK, JJ., concur.

## ON PETITION FOR REHEARING.

[*En Banc.*  February 28, 1914.]

GOSE, J.—In the opinion in this case, we said that the finding, that the respondent and his assignors were directed to quit work, was "not within the issues, nor is it supported by the preponderance of the testimony. There is no suggestion in the complaint that the respondent or his assignors were di-

rected to quit. On the other hand, the complaint is drawn upon the theory that they had performed their contract, that they had demanded deeds, and that the appellant's title to the land was defective." We also said:

"The appellant's version that they quit voluntarily because they claimed that they were not being paid for all the clearing is corroborated by the silence of the complaint upon this question, by the letter of their counsel, and by all the attending circumstances."

In the petition for rehearing, it is said that the opinion is in conflict with *Gold Ridge Mining & Development Co. v. Rice, ante* p. 384, 137 Pac. 1001, where we said:

"In respect to the contention that the counterclaim is not pleaded, it is sufficient to say that the evidence was admitted without objection, and, under the uniform decisions of this court, the issues became as broad as the evidence."

We do not regard the cases as conflicting. We did not hold in this case that the issues had not been broadened by the evidence, but merely adverted to the silence of the complaint, and its general theory and scope, as circumstances tending to corroborate the theory of the appellant; that is, that the respondent and his assignors voluntarily quit work. The two cases, when carefully read, show no inconsistency. After stating that the finding was not within the issues, we proceeded to discuss the evidence upon which the finding was based, and held that the respondent had failed to establish his discharge by a preponderance of the evidence.

It is also argued in the petition for rehearing that the letter set out in the opinion does not imply that the laborers voluntarily quit work. We think, when read in the light of the record, the letter is a circumstance tending to show that fact. Torn from its setting, it may not have that effect. It may even be a slight circumstance. Be this as it may, the writer of the opinion, after reading the abstract of the evidence, disregarding this letter, had no doubt that the respondent and his assignors voluntarily quit work because

they were dissatisfied with the acreage they had been allowed. After reading the evidence of the respondent and his witnesses touching the character of the work they did, in the light of the evidence of the several disinterested witnesses of the appellant upon that question, the conclusion was forced upon the writer that the testimony of the former was not trustworthy.

The petition is denied.

ALL CONCUR.